D86BPASH                    Hearing

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    MICHAEL L. PASTERNAK,

4                 Plaintiff,

5          v.                           10 CV 5045 (DC)

6    DOW KIM a/k/a DO WOO KIM,

7                 Defendant.

8    ------------------------------x
                                        New York, N.Y.
9                                       August 6, 2013
                                        10:08 a.m.
10
     Before:
11
                          HON. DENNY CHIN,
12
                                        Sitting by Designation
13
                             APPEARANCES
14
     HOLMAN LAW, P.C.
15        Attorneys for Plaintiff
     THOMAS A. HOLMAN
16
     McCALLION & ASSOCIATES LLP
17        Attorneys for Plaintiff
     KENNETH F. McCALLION
18
     COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
19        Attorneys for Defendant
     LEO V. LEYVA
20   JED MATTHEW WEISS
     JASON FINKELSTEIN
21
     ALSO PRESENT:
22        MEAGHAN GLIBOWSKI

23

24

25

```
 1              (In open court)

 2              THE DEPUTY CLERK:  This is Pasternak v. Kim, civil

 3   cause for a hearing.

 4              Will the parties state their appearances, please.

 5              MR. McCALLION:  Kenneth McCallion for plaintiffs.

 6              MR. HOLMAN:  Thomas Holman for plaintiffs as well.

 7   This is Meaghan Glibowski, who is a law school graduate.  Just

 8   took the bar exam.

 9              THE COURT:  Okay.  Good.

10              MR. LEYVA:  Good morning, your Honor.  Leo Leyva, Jed

11   Weiss and Jason Finkelstein on behalf of defendant, Mr. Dow

12   Kim.

13              THE COURT:  Okay.  So we're here for a Daubert hearing

14   with respect to Dr. Plancich.  We're not going to address all

15   of her testimony.  What I was particularly interested in was

16   the usage of the Merrill Lynch U.S. High Yield Master II Index.

17   I do need a little bit of an explanation of the compensation

18   structure so I can see how it fits in.

19              I guess I was also interested in just a little

20   background information about Mr. Pasternak.  Counsel can just

21   tell me, how old was he?  Where was he precisely before?  What

22   was he making?  That kind of thing.  His work history.

23              MR. HOLMAN:  Let's see.  He's currently 49, so at the

24   point that he is getting the offer from Morgan Stanley, he

25   would have been 43.  He was not working at the time.  He had
```

previously been a partner in a hedge fund venture.  He was a

principal and founder of that small hedge fund.  His

compensation, your Honor, to be honest, I don't recall exactly.

It was a fairly modest salary.  He did invest in the fund.  He

had been previously at Goldman Sachs Asset Management.  His

salary was, I believe, $275,000 and he was eligible for a

bonus.  The bonus was, typically on Wall Street, it was a

substantial portion of his compensation.  So he did achieve a--

I think in 2003 I believe he received a bonus of approximately

$750,000 on top of his salary.

        He had been at Goldman Sachs I believe since 1997 or

1998.  His salary I think ranged from $250,000 to about

$275,000 and the bonus.

        THE COURT:  He left Goldman when?

        MR. HOLMAN:  He left Goldman I believe in 2003.

        THE COURT:  Is that when he start the hedge fund?

        MR. HOLMAN:  He started the hedge fund roughly in

2003.  There may have been an interval; you know, three to six

months as they got that together.  So the launch date may have

been 2004, your Honor.  I'm not recalling exactly, but I think

that was right.

        THE COURT:  And the hedge fund went out of-- what

happened to it?  It went out of business?  It failed?  What

happened to it?

        MR. HOLMAN:  No.  What happened was there was a

1   disagreement between Mr. Pasternak and the co-founder and

2   Mr. Pasternak withdrew.  The consequence of that was that he

3   was a key man and a number of the investors also withdrew and,

4   I believe, withdrew their capital from the fund.

5            And I believe that some number of months later, the

6   hedge fund closed, but not while Mr. Pasternak was there.  And

7   so he --

8            THE COURT:  When was that, roughly, that he withdrew?

9            MR. HOLMAN:  He withdrew roughly in, I'm going to say,

10  April of 2006, give or take, your Honor.

11           THE COURT:  Okay.  And so for the roughly two or three

12  years that he was there, what was the best he did on a per

13  annum basis?

14           MR. HOLMAN:  At the hedge fund?

15           THE COURT:  At the hedge fund.  Roughly.

16           MR. HOLMAN:  I don't want to give an incorrect figure.

17  I do believe he had a draw.  What's coming into my mind may not

18  be correct.  It's 250, does that sound right?

19           MR. McCALLION:  Something like that.

20           MR. HOLMAN:  Something like $250,000.

21           THE COURT:  Total.

22           MR. HOLMAN:  As a partner's draw.

23           THE COURT:  Okay.  I'm trying to find out what his

24  compensation was.  Did they make any money in that time?

25           MR. HOLMAN:  Eventually they did make some money.  He

had invested in the fund and made some money on his investment.

Let's say he put a million dollars in the fund; he might have

gotten $1,250,000 back from that investment.  So he made some

money there.

          I'm just not remembering, your Honor, if there was a

bonus that the partners awarded themselves.  I can't as I stand

here recall exactly what that was.

          MR. McCALLION:  I'm not sure.  I'd have to check.

          MR. HOLMAN:  I'm not sure if things were that

successful that they were able to pay bonuses to themselves,

but if that's an important fact to your Honor, we certainly can

dig it out.

          THE COURT:  Well, obviously I'm asking because it

helps me evaluate the soundness of the damages computation of

roughly $2 million a year.  It has to come in the context of a

career.  And so I'm not holding you to it, but it seems to me

it's relevant what he made throughout his career.  I mean, you

don't make $200,000 a year and then suddenly jump to $2 million

a year for four years.  It may not mean that the testimony is

inadmissible, but it certainly is relevant.

          In other words, it sounds like the best he did at

Goldman was a million dollars a year.  And then he had a period

of time where he was making $250,000 plus maybe a little bit of

profit, then he's out of work, and then the argument is, well,

now he's-- he would have been making $2 million a year for four

1    years.  It raises some questions in my mind.  And it may go to

2    weight, not admissibility, but that's why I ask.

3              Just to finish it up, so he started at Goldman in

4    roughly 1997.  So that was roughly 16 years ago, so he was

5    roughly 33 or so.

6              What did he do before Goldman?

7              MR. HOLMAN:  He worked for Saudi International Bank.

8              THE COURT:  Doing what?

9              MR. HOLMAN:  He was a portfolio manager and he was in

10   charge of their high yield fixed income at some point.

11             THE COURT:  Okay.

12             MR. HOLMAN:  Your Honor, in terms of this two million

13   a year, Dr. Plancich will tell you, I think it's-- I believe

14   it's a little bit less than that.

15             THE COURT:  I was saying that roughing it-- by the

16   way, it's hard to see this chart with the tiny numbers, Exhibit

17   3, but the calculation is lost income is $8.6 million for a

18   part of 2007, and then from 2008 through 2011, plus there's

19   some post-2011 it says.  I'm just ballparking it.

20             MR. HOLMAN:  And in terms of precisely what

21   Mr. Pasternak was making-- and I apologize for not having his

22   compensation figures-- it certainly is intended to be part of

23   his direct testimony at the trial.

24             THE COURT:  Yes, I would assume so.

25             MR. HOLMAN:  I've heard those figures, but I can't,

1    unfortunately, give you an accurate recount this morning.

2                THE COURT:  That's fine.  That's good enough.  I just

3    wanted an idea.  I'm not going to hold you precisely to those

4    numbers.

5                Anybody want to tell me anything else?  Otherwise, we

6    can proceed.

7                MR. McCALLION:  Yes, your Honor.

8                THE COURT:  Okay.

9                MR. McCALLION:  We have prepared an exhibit list of

10   the exhibits that we would intend to have the good doctor refer

11   to today, if we could hand that up.  And we have a binder of

12   plaintiff's exhibits which largely track the trial exhibits

13   other than her report and reply report.  They're virtually all

14   trial exhibits.

15               THE COURT:  Okay.

16               MR. McCALLION:  I'd like to call Dr. Stephanie

17   Plancich.

18               THE COURT:  All right.

19               MR. LEYVA:  Your Honor, I apologize.  Just for

20   housekeeping issues, I was under the impression that we would

21   go first, defendants, to go through a litany of questions

22   rather than just-- if I'm mistaken --

23               THE COURT:  I didn't have a particular plan in mind.

24   I don't know, it's been a long time since I've done a Daubert

25   hearing.  It seems to me--

1          MR. LEYVA:  It's almost like voir dire almost.

2          THE COURT:  Except that it would be nice to have the

3    gist of the opinion before I hear your voir dire, which I'm

4    sure would venture into cross-examination.

5          MR. LEYVA:  That's fine, Judge.

6          THE COURT:  Let's start with direct and then that way

7    I could get-- I read the report this morning, but this way I'll

8    have a better feel for the report.

9          MR. McCALLION:  Doctor, if you would take the stand.

10   STEPHANIE PLANCICH, Ph.D.,

11        called as a witness by the Plaintiff,

12        having been duly sworn, testified as follows:

13         THE DEPUTY CLERK:  If you could state and spell your

14   full name for the record, please.

15         THE WITNESS:  My name is Stephanie Lynn Plancich.

16   That's S-t-e-p-h-a-n-i-e; middle name Lynn, L-y-n-n; and my

17   last name, Plancich, P-l-a-n-c-i-c-h.

18   DIRECT EXAMINATION

19   BY MR. McCALLION:

20   Q.  Good morning, Dr. Plancich.

21        Where do you currently work?

22   A.  I work at NERA Economic Consulting.

23   Q.  And what is your position?

24   A.  I'm a vice president at NERA.

25   Q.  What is your educational background starting with college?

D86BPASH                        Dr. Plancich - direct

A.   I have an undergraduate degree from the London School of

Economics.  It's a Bachelor of Science in economics, first

class honors.  And then I have a Ph.D. from the Massachusetts

Institute of Technology, also in economics.  I finished that in

2002.

Q.   Okay.  I'd like to show you your resume, which has been

previously marked as Trial Exhibit 129 for identification.

        MR. LEYVA:  Your Honor, we would stipulate to her

qualifications.

        THE COURT:  I think for these purposes that's fine.  I

actually reviewed the CV that's in the report.  I'm looking now

at Exhibit 129.  That's fine.  I think we can take it from

there.

Q.   Now, did you prepare a report relating to this particular

case?

A.   I did, yes.

Q.   And what calculations, if any, did you perform with regard

to this case?

A.   Sure.  I estimated the income of Mr. Pasternak, had he

accepted the offer from Morgan Stanley in 2007, from 2007

through September 2011.  I also estimated the income that

Mr. Pasternak actually received during that time period to

offset against the hypothetical income he would have had had he

taken the Morgan Stanley position.

Q.   Okay.  And did you issue a report relating to your

D86BPASH                          Dr. Plancich – direct

1    analysis?

2    A.  I did, in October of 2011.

3              THE COURT:  I have the report.

4    Q.  Now, what information did you rely upon in calculating what

5    income Mr. Pasternak would have if he had taken the position he

6    was offered at Morgan Stanley?

7    A.  Sure.  I used a number of different sources of information.

8    The first and sort of fundamental starting point of the

9    analysis was the offer letter that he received from Morgan

10   Stanley, which spelled out his compensation for 2007:  His base

11   salary of $275,000, his bonus of $1.5 million, plus a signing

12   bonus of $1 million.  So that was the offer on the table in

13   2007.

14             I also used a number of additional sources of

15   information.  These included data provided by Morgan Stanley

16   with regards to the long-term incentive bonus plan, the

17   structure around that; data related to the health and benefits

18   plan for Morgan Stanley.  I used information from

19   Mr. Pasternak, including his CV, to figure out his typical

20   tenure at positions historically.

21             I used information from public sources, so this

22   included things like the Merrill Lynch High Yield Master II

23   Index and U.S. Treasury data, return data; the Consumer Price

24   Index, other series, to estimate the potential growth and

25   Mr. Pasternak's income over time, as well as things like the

1    discount rate and the inflation rate that would have affected

2    his salary in this time period.

3              There may be other pieces of data I'm not remembering,

4    but that's the bulk of the material.

5              MR. McCALLION:  Your Honor, we would offer for

6    purposes of this hearing the documents and materials which

7    Ms. Plancich identifies in her report as having been relied

8    upon.  For the record, perhaps I could just refer to the trial

9    exhibit numbers--

10             THE COURT:  Sure.

11             MR. McCALLION:  -- relating to that.

12             As she mentioned, the offer letter was Trial Exhibit

13   2.  Michael Pasternak's presentation slides, excerpts, would be

14   Trial Exhibit 27.  The terms of the employment discussions with

15   David Germany were reflected in an e-mail marked as Trial

16   Exhibit 125.  The description of compensation received by

17   Michael Pasternak, which was an e-mail from counsel of Diamond

18   Lake, dated October 18th, 2011, is marked as Trial Exhibit 128.

19   The discretionary retention award stock unit summary

20   description for 2007 has been marked as Trial Exhibit 133.

21             THE COURT:  Is that a Morgan Stanley?  Yes?

22             MR. McCALLION:  Yes.

23             THE COURT:  Okay.

24             MR. McCALLION:  The investment management alignment

25   plan, otherwise known as an IMAP, from Morgan Stanley, 2007

D86BPASH                     Dr. Plancich - direct

1   award summary description, is marked as Trial Exhibit 134.  The

2   similar IMAP from Morgan Stanley for 2010 award summary

3   description, it's been marked as Trial Exhibit 135.

4            MR. LEYVA:  I'm sorry, Counsel, can you repeat the

5   last one again?

6            MR. McCALLION:  Sure.  The IMAP, I-M-A-P, 2010 --

7            THE COURT:  Are these all listed in your list of

8   plaintiff's exhibits?

9            MR. McCALLION:  Yes.

10           THE COURT:  Any objection to receiving these exhibits

11  for purposes of this hearing?

12           MR. LEYVA:  None, your Honor.

13           THE COURT:  All right.  Then the exhibits listed in

14  the plaintiff's list of Daubert hearing exhibits are all

15  received.

16           Now, they all have trial exhibit numbers except for

17  Items 1 and 2, which are the report and the reply report.  And

18  Item 28 is a deposition transcript of Mr. Germany.

19           MR. McCALLION:  We weren't planning to offer it at

20  trial, but it was relied upon by --

21           THE COURT:  That's fine.  These are received for

22  purposes of the hearing, not for trial.  Okay.

23           We can go really fast here.

24           MR. McCALLION:  Okay.

25           THE COURT:  We can go fast.  There's no jury.  I've

D86BPASH                          Dr. Plancich – direct

 1    read it.  I understand it.

 2              MR. McCALLION:  It's just really one exhibit I wanted

 3    to show, which is Pasternak Exhibit 2, Trial Exhibit 2, which

 4    is the offer letter.

 5              May I show it to the witness?

 6              THE COURT:  Yes.  So when you use the 2007

 7    compensation, what time period are you talking about in terms

 8    of calendar months?

 9              THE WITNESS:  So the 2007 compensation is in the offer

10    letter annualized, but we would have assumed he started work

11    the first business day of September 2007.  So it's about a

12    third of a year.

13              THE COURT:  9/1 --

14              THE WITNESS:  I think it's 9/4 because of Labor Day

15    and all the days, but it's 9/4/2007 through the ends of the

16    year.

17              THE COURT:  Through 12/31/2007.  Okay.  Thank you.

18              MR. McCALLION:  Okay.  Thank you.

19              THE COURT:  So that I'm clear, the numbers $275,000

20    and $1.5 million were numbers for the year?

21              THE WITNESS:  That's correct.

22              THE COURT:  Why don't you explain how that would have

23    worked.  I understand the base salary.  The bonus, how did that

24    work, the $1.5 million?

25              THE WITNESS:  We prorated both the base salary and the

D86BPASH                          Dr. Plancich - direct

 1   bonus to represent, again, approximately a third of the year.

 2   So in my estimate, I don't assume he's going to get that entire

 3   amount.  He's just going to get a third of it.

 4              THE COURT:  Okay.

 5              THE WITNESS:  Because he only worked a third.

 6              THE COURT:  But when they said here's a bonus of 1.5

 7   million, that was to cover what time period?

 8              THE WITNESS:  It's prorated from the date of

 9   employment commencement.

10              THE COURT:  I see.  Okay.

11         The second year there wasn't a fixed bonus.

12              THE WITNESS:  That's correct.  There's no guaranteed

13   bonus after 2007, after the first year of employment.  So

14   that's why we estimated the bonus --

15              THE COURT:  So would that have started a year from

16   when he started or would that have started on January 1, 2008?

17              THE WITNESS:  The way that it works is that the salary

18   is paid throughout the year, but the bonus is actually paid at

19   the end of the year.  So you have to work the entire year.  And

20   then if you're 30(b)(6), I can't remember what the record date

21   for the bonus is, but around the end of the year, then you earn

22   the bonus and you get paid it all at the year's end.

23              THE COURT:  Okay.  Go ahead.

24              MR. McCALLION:  Okay.

25   BY MR. McCALLION:

D86BPASH                          Dr. Plancich - direct

1   Q.   Now, so the offer letter, Exhibit 2, that reflects what

2   Mr. Pasternak's income would be for the first year or 12 months

3   that he worked there, you estimate from September 4, 2007 to

4   September of the following year?

5   A.   No.  We used the offer letter to estimate the 2007

6   compensation only.  So we take the base salary of $275,000 and

7   the bonus of $1.5 million and we prorate those to reflect

8   one-third of the year and that's our 2007 number.

9   Q.   Okay.  Now, how did you go about calculating any changes,

10  increases or decreases, in the bonus for Mr. Pasternak if he

11  had accepted the offer at Morgan Stanley?

12  A.   All right.  So we used this offer letter, which was sort of

13  money on the table, as the starting point.  And then we knew

14  from Mr. Germany's deposition testimony that Mr. Pasternak's

15  subsequent compensation in years after 2007 would be affected

16  by the performance of the portfolios he managed, which were

17  high yield bond portfolios.  That was his specialty.

18          So to estimate his bonus in the subsequent years, we

19  looked at the performance of high yield bond index, this

20  broad-based index, that Merrill Lynch High Yield U.S. Master II

21  Index, which represents a portfolio of all

22  below-investment-grade corporate bonds in the United States

23  that are dollar denominated.

24          And we looked at the return on that high yield index

25  and we used that to estimate the likely return of

D86BPASH                    Dr. Plancich - direct

Mr. Pasternak's own high yield portfolio that he managed and
that's the size of his bonus.  So if the high yield index, the
Merrill Lynch High Yield Index, went up a lot in the year, we
would expect that Mr. Pasternak's portfolios of high yield
securities would go up, his bonus would go up.  If it went
down, we would expect that Mr. Pasternak's high yield
portfolios would go down and his bonus would also go down.  So
it would follow the performance of this high yield index.

Q.  Now, why did you use the Merrill Lynch index as opposed to
some other yardstick or criteria?

A.  The Merrill Lynch index is really a standard, I don't want
to say the gold standard, but it's really a standard index used
to measure the performance of high yield bond securities in the
United States.  It's the index that's reported by the Federal
Reserve Bank.  They have a data system called FRED, F-R-E-D,
that's run by the St. Louis Fed that tracks economic data,
equities as well as debt securities.  And they use this Merrill
Lynch High Yield Master II Index as the representative index
for how high yield debt is performing in the country.

        It's also frequently used by other kinds of funds,
mutual funds that invest in high yield securities or other
kinds of hedge funds, as a benchmark index.  So if a particular
fund is trying to measure its performance relative to
something, they frequently use this Merrill Lynch index as the
benchmark against which they measure their own performance.

D86BPASH                          Dr. Plancich - direct

1          THE COURT:  So some funds do better, some funds do

2    worse?

3          THE WITNESS:  Absolutely.

4          THE COURT:  And just explain again why you picked this

5    one.

6          THE WITNESS:  I picked this particular index because

7    it's all the U.S. below-investment-grade corporate debt in the

8    United States that's tradeable.  So it has all the data in it.

9    It's sort of like the S&P 500 has all the five hundred largest

10   equities in it in the United States.  This is --

11         THE COURT:  This is comparable --

12         THE WITNESS:  -- for high yield debt security.  So

13   it's very broad based.  And then the index itself is just

14   widely known and used in the fixed income world.  So it's a

15   very common benchmark.

16         THE COURT:  Now, Mr. Pasternak would have been a

17   managing director in the global fixed-income group at Morgan

18   Stanley?

19         THE WITNESS:  Yes.

20         THE COURT:  He would have been the head of the high

21   yield U.S. portfolio team.  Is that right?

22         THE WITNESS:  Yes.

23         THE COURT:  Are those funds?  Are they funds

24   themselves that have a measure of performance that we could

25   track over the years?

D86BPASH                              Dr. Plancich - direct

1          THE WITNESS:  So my understanding from the deposition

2     of Mr. Germany is that Mr. Pasternak would have managed U.S.

3     high yield portfolios, which would have included some funds,

4     maybe a number of funds.  Retail funds, institutional funds.

5     He also would have been in charge of selecting high yield

6     investments as part of other fixed-income products.  So

7     Mr. Germany discusses the Core Plus Fund, which had some

8     corporate-grade debt, had other types of securities as well as

9     high yield.

10          THE COURT:  And so his compensation would have been

11     pegged to the performance of those portfolios?

12          THE WITNESS:  Yes.  Mr. Germany says that

13     Mr. Pasternak would have been rewarded based on his

14     performance, which involved managing high yield portfolios

15     across all of these different funds inside the global

16     fixed-income unit.

17          THE COURT:  Do we know how those portfolios did from

18     2007 through 2011?

19          THE WITNESS:  No.  That's not public data the way that

20     the Merrill Lynch index is public data, where I can go to the

21     Federal Reserve website and just download it and look at its

22     returns.  Within Morgan Stanley they have a number of these

23     funds.  Some of these funds are part of rich individuals'

24     private assets, so obviously that's not disclosed, or

25     institutional assets that that's just nonpublic information.

D86BPASH                          Dr. Plancich – direct

1            There was one --

2            THE COURT:  That information would be available

3    internally?

4            THE WITNESS:  It would be available internally, yes.

5            THE COURT:  I mean, they would have had to look at it

6    to figure out what his compensation would have been.  Right?

7            THE WITNESS:  That's correct.

8            THE COURT:  And was that information ever provided to

9    you?

10           THE WITNESS:  No.  I don't have any breakdown of what

11   the performance was of the assets within the global

12   fixed-income fund.  We looked in the Morgan Stanley 10-Ks to

13   see if it was public information, and it's not.  They don't

14   break down the performance of their groups at that level.  They

15   just broadly discuss asset management and investment banking,

16   things like that.

17           THE COURT:  Did you ever ask for --

18           THE WITNESS:  Did I ask for the performance of the

19   global fixed-income unit?  No.

20           THE COURT:  That's my question.  In other words, I

21   would think that if you were trying to figure out what he would

22   have earned at Morgan Stanley, it would have been useful to

23   know -- obviously he wasn't there, but it would be useful to

24   know how those particular portfolios performed.

25           Is that an incorrect assumption on my part?

D86BPASH                              Dr. Plancich - direct

1          THE WITNESS:  Certainly I would have looked at that

2     information had it been part of the confidential materials we

3     received from Morgan Stanley, but I think I would argue as an

4     economist that's not the number that I would have plugged into

5     my damages estimate.

6          THE COURT:  And why not?

7          THE WITNESS:  I still would have preferred to use the

8     broad-based Merrill Lynch Index.  Because if I used the Morgan

9     Stanley-specific data, what I'm picking up is the return of the

10    person who's not Mr. Pasternak, the individual guy with his

11    individual strategy who's running those funds.

12         THE COURT:  The guy who left I think like eight months

13    later.

14         THE WITNESS:  Yes, but then, if this is a long period,

15    then Mr. Schaney -- I'm not sure if I'm supposed to use

16    names -- but then the person after the eight-month guy, then he

17    was there through 2010 till the funds were sold to Invesco.

18    But it's some specific other person who's not Mr. Pasternak who

19    has his own strategy, who's got his own luck in terms of

20    investment.

21         THE COURT:  So I think what I'm hearing is it would

22    have been nice to have had that information, but you would have

23    wanted to use the Merrill Lynch Index anyway?

24         THE WITNESS:  My expectation is, yes, I would have

25    used the broad-based index because I don't want to be measuring

D86BPASH                        Dr. Plancich - direct

1    the idiosyncratic performance of a specific portfolio manager

2    who's not Mr. Pasternak.  I want to look more broadly and take

3    out that variability that comes --

4              THE COURT:  And the Merrill Lynch is not

5    idiosyncratic, I gather from what you're saying, because it's

6    so broad it picks up everything.

7              THE WITNESS:  It's all the bonds, that's correct.

8              THE COURT:  Did you then decide whether you should go

9    up and down for any particular factors that might have affected

10   the analysis?  Did you consider that or did you just stick with

11   the performance?

12             THE WITNESS:  I used the performance to grow and

13   shrink his bonus.  So, for example, in 2008, that was a very

14   bad year for high yield debt.  So the bonus I estimate for 2008

15   is much lower than 2007.

16             THE COURT:  What bonus was there for 2008?

17             THE WITNESS:  In 2008, I think the annualized number

18   is $1.1 million.

19             THE COURT:  As a bonus?

20             THE WITNESS:  As a bonus.  So from 1.5 --

21             THE COURT:  Is that the year where the yield was minus

22   26 percent?

23             THE WITNESS:  Down 26 percent, that's right.

24             THE COURT:  Why would he get a bonus at all if it was

25   minus 26 percent?

D86BPASH                         Dr. Plancich - direct

1          THE WITNESS:  The majority of the compensation paid

2     out to these investment managers is their bonus.  And they get

3     a bonus pretty much every year unless-- this is, again, from

4     the Germany deposition -- unless they're leaving the firm, they

5     don't stay the full year, or some major extraordinary event

6     happens and no bonuses are paid at the firm.  So even though

7     your bonus will scale up and down in size --

8          THE COURT:  What bonus did you give him for 2008?

9          THE WITNESS:  2008, the total award was one point-- I

10    think $1.1 million.  I'm sorry, I don't have the numbers right

11    in front of me, but approximately 1.1.

12         THE COURT:  Do you have your exhibit there?

13         THE WITNESS:  No, I just have the offer letter.

14         MR. McCALLION:  Would that relate to Exhibit 3 of your

15    report or --

16         THE COURT:  I'm looking at Exhibit 3, so if someone

17    can give her a copy, that would be good.

18         THE WITNESS:  It's easiest to see in the additional

19    exhibit, the hearing exhibit that I made yesterday.  Exhibit 3

20    has a lot of things going on it.

21         THE COURT:  Okay.  Is this a new exhibit?

22         MR. McCALLION:  I'm showing you your Exhibit 3 of your

23    report which is marked as Trial Exhibit 131.

24         THE COURT:  She just said she did prepare a hearing

25    exhibit.

D86BPASH                           Dr. Plancich - direct

1                MR. McCALLION:  Yes, and that would be --

2                THE COURT:  Is this it?

3                MR. McCALLION:  That would be Pasternak 168.

4                THE COURT:  168.

5                THE WITNESS:  Thank you.

6                THE COURT:  Whichever one you want-- 168?

7                THE WITNESS:  168 really illustrates how we're using

8      the --

9                THE COURT:  Okay, 168.  Got it.

10               MR. LEYVA:  This is the new one.

11               MR. McCALLION:  Yes.

12               THE COURT:  So here's my question now:  The return on

13     Merrill Lynch was minus 26 percent; total bonus compensation

14     is, as you said before, $1.1 million.

15               THE WITNESS:  Yes.

16               THE COURT:  Why would he get a $1.1 million bonus if

17     the return was minus 26 percent?

18               THE WITNESS:  I mean, it's the way that the salaries

19     are structured in investment management generally, in

20     investment banks, is that the base is very low and steady and

21     the vast majority of your compensation comes from bonus.  And

22     that bonus has more flexibility to go up and down, but it's

23     not-- you typically get paid bonus every year.  It's not --

24               THE COURT:  Even when you lose a lot of money?

25               THE WITNESS:  Yeah.

D86BPASH                          Dr. Plancich - direct

1          THE COURT:  That's right?

2          THE WITNESS:  Yes.

3          THE COURT:  That's the way the industry works?

4          THE WITNESS:  Yes.  You're losing money based on the

5    returns of the types of securities in which you're investing as

6    opposed to some specific thing that you did that was unusual,

7    but, yes.  So you would get less bonus.

8          THE COURT:  Do you know whether at Morgan Stanley the

9    portfolios lost money during this time period?

10         THE WITNESS:  I don't know anything about the universe

11   of portfolios that would have been managed by Mr. Pasternak had

12   he taken this position.

13         THE COURT:  Do we know whether at Morgan Stanley if

14   there had been a return of minus 26 percent, he would have

15   gotten a bonus of $1.1 million or thereabouts?

16         THE WITNESS:  Again, my understanding from the Germany

17   deposition, and just other cases I've worked on that involve

18   the asset management business, is that you typically-- bonus is

19   paid every year.  It's not something that you only get a bonus

20   in a good year and you don't get it in a bad year.  And it's

21   because the vast majority of your compensation is bonus.  And

22   because it is bonus, it would have much more variability in it

23   than if it were baseline, but you still get some bonus in down

24   years.

25         THE COURT:  Now, in 2009 there's a return of 58

1    percent plus and the bonus is 1.7.  So the bonus, indeed, goes

2    up significantly.  But then I see that for 2010, the return is

3    only 15 percent.  So it's dropped from 58 to 15, but yet the

4    bonus goes up to two million.

5              THE WITNESS:  Right.

6              THE COURT:  How does that happen?

7              THE WITNESS:  We're basing it off the prior year.  So

8    in 2008, they went into a big hole.  They went down 26 percent.

9    In 2009, a big chunk of that return is just getting back to the

10   baseline where you were when you started in 2007.  So that's

11   what it gets you back to, the 1.5 million, and then you get

12   more for going above and beyond that.

13             THE COURT:  Is there something called a high

14   watermark?  A high watermark?

15             THE WITNESS:  I'm not sure what you mean by that.  I'm

16   sorry.

17             THE COURT:  The $1.7 million that's paid in 2009, was

18   that for 2008?  Is that what you're telling me?

19             THE WITNESS:  No.  So this is for the return in 2009.

20   It would have been paid January 1st, 2010, essentially.

21             THE COURT:  I see.  Okay.

22             If I'm a juror and I'm looking at these numbers, it

23   just doesn't make a lot of sense to me.

24             THE WITNESS:  That --

25             THE COURT:  Well, that you lose 26 percent and you get

D86BPASH                         Dr. Plancich - direct

1   a $1.1 million bonus; that you go from 58 percent in one year

2   to 15 percent the next year, which is a significant drop in the

3   return, and yet your bonus goes up to $2 million.

4           THE WITNESS:  Well, if you think about it in the

5   growth of the value of the assets under management -- maybe

6   that's a better way to think of it.  So if you --

7           THE COURT:  Well, what does annual return mean?

8           THE WITNESS:  The annual return is the-- the index is

9   just a normalized number.  It's not an actual price.  But if it

10  started at 100 on the first day of 2008, at the end of the

11  year, it would be at 74.  So it drops quite --

12          THE COURT:  Meaning the value of your-- if you had

13  $100 invested in securities in this fund, by the end of the

14  year it's worth $74?

15          THE WITNESS:  That's correct.

16          THE COURT:  I'm having trouble understanding why the

17  managers of this portfolio would earn millions of dollars in

18  bonuses.

19          THE WITNESS:  I think you should think about it-- or I

20  would suggest we think about it as total compensation.  So for

21  practical purposes, the investment banks break you down into a

22  base salary and into a bonus amount.  But really what a bonus

23  means in the context of investment bank compensation, it's

24  really their total compensation.  The vast majority of their

25  pay is bonus.

D86BPASH                        Dr. Plancich - direct

1          THE COURT:  Let me ask some other questions so that I

2    understand this.

3          THE WITNESS:  Okay.

4          THE COURT:  So if we take the bonus for 2007, it was

5    $1.5 million.  Some of it was cash and then some of it was this

6    long-term income.

7          THE WITNESS:  Yes.

8          THE COURT:  And as I understand your report, the

9    long-term income was roughly 30 percent equity, that is Morgan

10   Stanley stock; roughly 50 percent was this IMAP plan, which was

11   pegged to the portfolio, the fund managed by the employees.

12         THE WITNESS:  Yes.

13         THE COURT:  And then 20 percent was other investment

14   options.  So just explain how you used the Merrill Lynch Index

15   in figuring out those amounts.

16         THE WITNESS:  So the Merrill Lynch Index we used in

17   column 4 of this table to grow his total bonus compensation, or

18   shrink it --

19         THE COURT:  Column 4 is the number 4?

20         THE WITNESS:  Yes.

21         THE COURT:  Got it.

22         THE WITNESS:  Yes.  So we use it there.  And then we

23   don't use it in columns-- columns 5 and 6 is just taking that

24   bonus amount and splitting it essentially into 66 percent and

25   34 percent.  And that split comes from other documentation we

D86BPASH                      Dr. Plancich - direct

1   saw from Morgan Stanley which said other managers-- other

2   managing directors got 66 percent of their bonus in cash and

3   the other 34 percent in this long-term investment plan.

4            THE COURT:  What is the formula for figuring out

5   column 4?  It looks like you have something up above there.

6            THE WITNESS:  Yes.  So what we're doing is we're not

7   starting with the $1.5 million in each year.  We only start

8   with the $1.5 million in 2007 and then we prorate it because he

9   only worked a third of the year.  So that's the number

10  $489,000, is just a third of the bonus.

11           THE COURT:  So start with another year.

12           THE WITNESS:  So in 2008, what we do is we know he got

13  $1.5 million.  That's the annualized number for 2007.  And we

14  assume that his bonus would be 26 percent lower because high

15  yield bonds performed badly in 2008, so we shrink his bonus to

16  $1.1 million.

17           THE COURT:  I see.

18           THE WITNESS:  But then in 2009, we start with the $1.1

19  million.

20           MR. LEYVA:  Your Honor, I apologize.  Can I ask for

21  that answer to be given back again with regard to 2008?

22           THE COURT:  Sure.  Please read it back.

23           (Record read)

24           MR. LEYVA:  Thank you so much.

25           THE COURT:  So then I gather for 2009, because it was

D86BPASH                        Dr. Plancich - direct

1    58 percent higher, you took the assumed bonus for the year

2    before, 1.1, you multiplied that by 58 percent and you added it

3    to get 1.7?

4              THE WITNESS:  Exactly.

5              THE COURT:  Okay.  And where do you get that formula

6    from?  That is, taking the index for the year and multiplying

7    it times the bonus from the prior year?

8              THE WITNESS:  So this is a standard approach in terms

9    of estimating the impact of an index return on some series of

10   cash flow.  So methodologically it's what we would use in other

11   context when we want to see how --

12             THE COURT:  Based on what?  I mean, is that industry

13   standard?

14             THE WITNESS:  Yes.

15             THE COURT:  Do we know that, indeed, Morgan Stanley

16   did that?

17             THE WITNESS:  Oh, no, we don't because we don't--

18   we're assuming that his bonus tracks the performance of the

19   Merrill Lynch high yield index.  And we base this assumption on

20   the testimony of Mr. Germany which said his compensation is

21   going to, you know, move with the performance of high yield--

22   his high yield portfolios.  But we don't have any data from

23   Morgan Stanley that says this is the formula that they would

24   use.  Morgan Stanley in their documentation actually doesn't

25   spell out any formula whatsoever.

D86BPASH                         Dr. Plancich - direct

1          THE COURT:  But why do you make this assumption?

2     That's what I'm asking.  Is this the way it's done in the

3     industry?

4          THE WITNESS:  It's absolutely true that in the

5     industry if you're a portfolio manager, you're compensated

6     based on the performance of the assets that you manage.

7          THE COURT:  But that's a general statement.

8          THE WITNESS:  Yes.

9          THE COURT:  And you're using a very-- I always thought

10    bonuses were somewhat discretionary.  Management looks at the

11    whole thing -- and maybe I'm just thinking of law firms.  But

12    you're using a specific mathematical calculation.  And what I'm

13    trying to find out is, is this industry standard?  How do you

14    come up with this?  If it is industry standard, on what do you

15    base that?  Do you follow me?

16         THE WITNESS:  Yes.

17         THE COURT:  You just said we assumed this is the

18    industry standard.  If I were to go to Goldman Sachs, is this

19    the way they calculate their bonuses?

20         THE WITNESS:  It's definitely industry standard that

21    if your job is to manage assets, your compensation is going to

22    be tied to the performance of the portfolio.

23         THE COURT:  I understand that, but you're taking a

24    specific percentage.  I mean, of course your bonus is tied to

25    your performance.  I mean, that's true.

D86BPASH                              Dr. Plancich - direct

1              THE WITNESS:  In a very explicit way in this industry

2    because your performance is measured in dollars and in numbers

3    and in returns.

4              THE COURT:  Could I look it up somewhere?

5              THE WITNESS:  The specific formula used by any one

6    investment bank, you're right, is completely proprietary.  It's

7    very clear in the Morgan Stanley documentation that they have

8    discretion to award these bonuses.  We know from Mr. Germany's

9    testimony and his deposition that the expected compensation

10   for Mr. Pasternak was going to be a function of his

11   performance.  And this Merrill Lynch U.S. High Yield Master II

12   Index is, I think, a very reasonable proxy for Mr. Pasternak's

13   performance.

14             THE COURT:  I'm actually okay with using the Merrill

15   Lynch, I think, subject to cross-examination.

16             THE WITNESS:  Okay.

17             THE COURT:  I understand what you've said.  Assuming

18   it's true that it's akin to the S&P 500, I don't have a real

19   problem with that.  I mean, I understand it.

20             What I'm having trouble with now is you are suggesting

21   that it's not a discretionary matter; that there is this

22   precise mathematical way of calculating a bonus and that does

23   not seem right to me.

24             THE WITNESS:  That's not what I'm saying.

25             THE COURT:  Tell me what you're saying.

D86BPASH                          Dr. Plancich - direct

1          THE WITNESS:  I'm saying that we know that bonus does

2     track performance and we don't know the specific proprietary

3     decision-making process at any investment bank about what exact

4     bonus will be awarded.  There may be no formula at all.  I

5     mean, it may be that they look at individual traders and they

6     eyeball it and they say, okay, you get these various amounts.

7          We know that it's an extremely competitive industry

8     and that we --

9          THE COURT:  I think I understand what you're saying.

10    What you're saying is you go back to the base mark of the 1.5.

11    When they hired him, or made him an offer, they said you're

12    going to get 1.75 million a year in total comp, 1.5 being bonus

13    guaranteed, and that thereafter it will fluctuate.  You're

14    making an estimate or offering an opinion on what he would have

15    gotten and this is one way of doing this.

16         THE WITNESS:  Absolutely.  This is an estimate.  It's

17    not a --

18         THE COURT:  Is there something that says that this is

19    a reasonable way of doing this?  I mean, look, it may be

20    logical, there may be some logic to it, but it can't just be

21    something that you've made up, in other words.  So where do you

22    get this from?

23         THE WITNESS:  We get it, again, from the offer letter

24    and the testimony of Mr. Germany.  So that's the Morgan Stanley

25    specific piece of this analysis.

D86BPASH                          Dr. Plancich - direct

1          THE COURT:  Not that part.  I understand all that.

2     The part where you say if he made a bonus in year one, then in

3     year two the bonus would be whatever the index was, multiply

4     one point whatever the index is, and that would have been his

5     bonus in the second year.

6          THE WITNESS:  That's my best estimate of his bonus.  I

7     think that using an index to approximate the returns for

8     something when Mr. Pasternak didn't have this job -- we don't

9     know what his performance actually would have been.  It's a

10    common use to, in damages estimates, in economic analysis, to

11    use the index return as a proxy.  It's a proxy.  It's not the

12    formula, it's not the number, but I think it's an extremely

13    reasonable proxy.

14         THE COURT:  Have you opined along these lines in other

15    cases?

16         THE WITNESS:  I certainly have done a number of cases

17    that have not gone to testimony where we used this similar

18    approach.  So, for example, in broker-customer disputes that

19    may be going to FINRA arbitration, if someone says, You put me

20    in an investment that was unsuitable and I have to estimate

21    what would your "but for" investment have been, I would use the

22    index returns.  I would use this exact same kind of formula to

23    estimate what your hypothetical series would have been.

24         THE COURT:  I understand.

25         Do you want to ask any other questions?

D86BPASH                        Dr. Plancich - direct

1              MR. McCALLION:  Just a couple.

2              THE COURT:  Okay.

3    BY MR. McCALLION:

4    Q.   In the field of labor economics, are there certain models

5    or formulas that are used in determining fluctuating income or

6    bonuses?  And, if so, did you apply that in this case?

7    A.   The general methodology is it's very company specific or

8    case specific.  Exactly as you indicated, a law firm may have a

9    very different model about what drives bonus in any particular

10   year.  In an investment bank or investment management, what

11   drives bonus is the performance of the portfolio under

12   management.

13             So that's-- and that we use in a wide variety of

14   cases, so that's what we've used here.  So you have to look at

15   it in a case-specific context.  If the bonus is driven by

16   something, number of clients or something else, sales reps, it

17   would be different.

18             THE COURT:  Did you consider in this analysis for

19   2008, for example, the fact that it lost-- that the yield went

20   down 26 percent?  You're assuming that if Mr. Pasternak had

21   been the manager of this portfolio, the portfolio lost 26

22   percent, right?  Yes?

23             THE WITNESS:  Yes.

24             THE COURT:  Did you think about whether he would be

25   deserving of a discretionary bonus in that circumstance?

1            THE WITNESS:  See, again, I really think you need to

2    look at this as total compensation.

3            THE COURT:  My question was --

4            THE WITNESS:  Yes, I did.

5            THE COURT:  -- did you consider it?

6            THE WITNESS:  Yes.  And I do think he would have

7    gotten a bonus because that's the way compensation works at

8    investment banks.  If you look at the total number, his pay is

9    going down by 25 percent over almost-- 20-plus percent that

10   year.  So that's a big negative hit to him.

11           THE COURT:  Is there something --

12           THE WITNESS:  If you look at it as the whole number,

13   right.

14           THE COURT:  Is there something I can look up and read

15   that says in this industry these investment bankers get paid

16   even if they lose money?

17           THE WITNESS:  In this case Mr. Germany says that.  He

18   says that you get a bonus every year unless you're leaving the

19   firm.

20           THE COURT:  Mr. Germany says that?

21           THE WITNESS:  Yes.  He says that bonuses are paid --

22           THE COURT:  I'd like to see the page cites to that.

23           Is there any treatise or anything-- you know, when an

24   expert testifies, one of the things you look at is, can we look

25   it up somewhere?  Is there any place where I could look it up

D86BPASH                              Dr. Plancich - direct

1    where someone would say it is industry practice for investment

2    bankers to get paid even when their funds lose money?

3              THE WITNESS:  I'm sure that-- I don't have a cite off

4    the top of my head, but I do feel that you can look and see.

5    It's usually -- the total amount of bonuses paid by investment

6    banks are made public every year.  So every year around

7    Christmastime, all the investment banks say, okay, the bonus

8    pot is going to be this much money in each year.  You'll see

9    even when the markets are down, the pot shrinks, but there's

10   still a pot that's paid out.

11             THE COURT:  You were in the courtroom when we started

12   and I was asking about his work history and his compensation

13   history.

14             THE WITNESS:  Yes.

15             THE COURT:  It sounds like at one point maybe he made

16   a million dollars in total compensation at Goldman, but then he

17   was with this hedge fund, which things didn't work out.  He may

18   have made a little bit of money, otherwise it was the fairly

19   typical draw of roughly $200,000, $250,000 a year.  Under your

20   analysis, you're opining that, in essence, he was making almost

21   $2 million a year for four years.

22             Did you consider that at all, his work history and

23   compensation history?  My first question is, simply:  Did you

24   consider it?

25             THE WITNESS:  Yes.

D86BPASH                              Dr. Plancich - direct

1           THE COURT:  And you found out what his compensation

2     history was?

3           THE WITNESS:  No.  I know that he ran a hedge fund

4     because he didn't have an investment banking position in the

5     years prior to the offer letter.  And that I didn't go back

6     five, six, seven years ago, his salary that long ago, because

7     it seemed to me that he was in a different stage of his

8     career.

9           THE COURT:  But is it logical for someone who's been

10    making, at most, a million dollars a year suddenly to jump to

11    $2 million a year just like that?

12          THE WITNESS:  Absolutely.

13          THE COURT:  Absolutely.

14          THE WITNESS:  Because he has an offer letter on the

15    table that said that the market valued him at 1.775 plus a

16    million dollar signing bonus.  I mean, that was the bird in the

17    hand.  The market looked at his skill set and they said that's

18    what you're worth.

19          THE COURT:  But it was at-will employment.  Right?

20          THE WITNESS:  Yes, that's my understanding.

21          THE COURT:  And so is it completely irrelevant to you

22    that this would have been more than double anything that he

23    ever made in his entire work history?  Irrelevant?

24          THE WITNESS:  Yes, it's irrelevant.  I understand what

25    his work history is.  It doesn't surprise me, based on his work

D86BPASH                          Dr. Plancich - direct

1    history, that he's moving to-- he ran a hedge fund, which has

2    built his skill set.  The compensation structure at a hedge

3    fund is very different from what an investment bank is.  So the

4    fact that he didn't have this standard annual bonus that you

5    get when you're at a giant firm, when he was running his own

6    hedge fund, that doesn't surprise me.  So the fact that those

7    numbers look different is not at all surprising.  But we have a

8    market value for his salary in 2007.  It's on paper and it's

9    very high.

10                THE COURT:  Okay.  Anything else?

11                MR. McCALLION:  One other area.

12    BY MR. McCALLION:

13    Q.  Did you use any other data specifically relating to hedge

14    funds in evaluating your estimates or calculations of what

15    Mr. Pasternak's income would have been?

16    A.  I did do a check.  We collected data from the Hedge Fund

17    Research Institute -- it's not institute.  It's the Hedge Fund

18    Research.  It's Appendix 1 in my report.  And this shows the

19    return for hedge funds in similar categories to the portfolios

20    that Mr. Pasternak would have managed, so involving high yield

21    securities.  It's fixed income and credit arbitrage.  And we

22    looked at the average return of the hedge funds in the same

23    time period and we found that it was very similar to the

24    Merrill Lynch Index that we used.  So on average the Merrill

25    Lynch Index annual return was 12 percent over this period.  The

D86BPASH                          Dr. Plancich - direct

1    average return for a hedge fund was 11.2 percent, I think, so

2    it was right in line.

3           And we just did this as a check.  I still think that

4    the Merrill Lynch Index is the best.

5           THE COURT:  Are there industry reports on what

6    compensation is in the industry, bonuses in the industry?  I

7    mean, is there something that one could look up to see how

8    compensation changed from 2008 to 2009 to 2010?  Are there such

9    reports?

10          THE WITNESS:  There's very, very broad public data

11   released by the investment banks on general total bonus

12   payments for the whole firm.  So you can get that information,

13   but the detailed level of compensation at banks is still

14   proprietary.

15          THE COURT:  For example, would it be useful to know

16   whether in the industry, because of the flat year, the flat

17   performance in 2008, as a whole bonuses went down 50 percent

18   this year?  Are there such reports?

19          THE WITNESS:  We looked for data like that and there

20   was no publicly available data that went into that kind of

21   detail.  That's fairly proprietary information.

22          THE COURT:  I just think with all of the uproar over

23   the financial problems and the stuff that was going on, whether

24   anyone did any studies of whether bonuses in general were going

25   up or down and whether you looked at any of that.

1          THE WITNESS:  We looked for public information on the

2     bonus payments for the relevant peer group here, which is

3     people who run high yield portfolios, and we weren't able to

4     find public information at that level.

5          THE COURT:  Okay.  Mr. McCallion, I took over the

6     examination, but why don't you finish up and then let's see if

7     there's cross.

8          MR. McCALLION:  Perhaps we could respond to your

9     Honor's request for the reference to the Germany deposition.

10          THE COURT:  Sure.  Yes.

11          MR. McCALLION:  I'm referring to page 160 of

12     Mr. Germany's deposition.

13          THE COURT:  Thank you.  Is that in here?

14          MR. HOLMAN:  Your Honor, it's toward the end.

15          THE COURT:  What exhibit number is that?

16          MR. HOLMAN:  It's not an exhibit number.

17          MR. McCALLION:  It's second to the last, I think.

18          MR. HOLMAN:  It's the tab citing "D. Germany."

19          THE COURT:  I see.  Got it.  Thank you.

20          MR. LEYVA:  Do you have a copy of that, Tom, by any

21     chance?

22          THE COURT:  Mine doesn't go up to 160, though.

23          MR. HOLMAN:  Your Honor, you have the mini, four pages

24     to the page?

25          THE COURT:  Yes.

1            MR. HOLMAN:  Okay.  So --

2            THE COURT:  My last page is 89.

3            MR. HOLMAN:  Okay.  So if you go to --

4            MR. McCALLION:  Oh, I'm sorry, it's pages 59 and 60.

5     Perhaps I misspoke and said 160 --

6            THE COURT:  I thought you said 160.

7            MR. McCALLION:  I'm sorry.  Pages 59 and 60.

8            THE COURT:  Got it.  Thank you.

9            MR. McCALLION:  The colloquy actually starts on 58,

10    your Honor.

11           THE COURT:  Okay.  I'll study it more later.

12           MR. McCALLION:  Thank you.

13           THE COURT:  We'll have cross.

14    CROSS-EXAMINATION

15    BY MR. LEYVA:

16    Q.  Good morning, Dr. Plancich.

17           Just so we're clear, Dr. Plancich, with regard to your

18    history and your qualifications, you never worked at an

19    investment bank.  Correct?

20    A.  That's correct.

21    Q.  You've never had any input or say as to how a portfolio

22    manager's compensation would be structured in any given year.

23    Correct?

24    A.  That's correct.

25    Q.  And it's fair to state that you don't have any NASDAQ

1   certifications?

2   A.  Not anymore.

3   Q.  Okay.

4   A.  They're old.

5   Q.  It's fair to state that you're not familiar with the

6   day-to-day responsibilities of a portfolio manager such as

7   Mr. Pasternak in the position he would have taken at Morgan

8   Stanley.  Correct?

9   A.  Sort of.  I certainly know what a portfolio manager does.

10  My dissertation involved study of mutual funds and other

11  investment management assets.  I've worked in cases so I have a

12  good sense of what he does.

13  Q.  We have your report.  And if I go to page 1 of your report,

14  it says that you were asked to calculate Michael Pasternak's

15  hypothetical income stream, assuming that but for defendant's

16  action, he would have taken that position.  You see that on

17  page 1.  Correct?

18  A.  That's correct.  I'm sorry, I don't have the report so--

19  Q.  I will represent to you that I'm reading.  Your terms were

20  it was a hypothetical income stream.  Correct?

21  A.  That's correct.

22          MR. McCALLION:  Could I provide her with that?

23          THE COURT:  Yes, sure.

24          You said you never worked for an investment bank.  Do

25  you know how bonuses are decided or determined at an investment

D86BPASH                          Dr. Plancich - cross

1   bank?

2            THE WITNESS:  I read the materials that Morgan Stanley

3   turned over, so to that extent.  And then I worked on many

4   cases involving individuals who work at investment banks, so in

5   that sense I have familiarity with their compensation

6   structure.  But I've never worked at a bank or been involved in

7   setting compensation at a bank, for sure.

8            THE COURT:  Okay.

9   BY MR. WEISS:

10  Q.  Just so we're clear, also, Doctor, you actually saw the

11  term sheet that Mr. Pasternak signed with Diamond Lake, the

12  investment fund that he actually joined and which resulted in

13  turning down this Morgan Stanley offer.  You saw that.

14  Correct?

15  A.  I am not-- I don't recall.

16  Q.  So it's fair to state that you did not take into

17  consideration or your report does not reflect the fact that the

18  job, the position that Mr. Pasternak took at Diamond Lake paid

19  him an annual salary of a $200,000 draw.  Correct?

20  A.  No, that's incorrect.  That is built into my report.

21  Q.  Oh, that is.  So you understood he was taking a $200,000

22  draw and there was no guaranteed bonus in that term sheet.

23  Correct?

24  A.  What I requested -- and I believe that the information came

25  to me from counsel -- is what he actually earned--

D86BPASH                        Dr. Plancich - cross

1    Q.  I understand.

2    A.  -- during this period of time at--

3    Q.  My question to you is, you didn't take into consideration

4    or raise in your report the fact that Mr. Pasternak accepted a

5    position at Diamond Lake where his draw would have been

6    $200,000 annually.  Correct?

7    A.  Right.  That's incorporated into my report.

8    Q.  It doesn't say in your report, though, that there was no

9    guarantee of any bonus at that fund which he agreed to join.

10   Correct?

11   A.  Right.  That's irrelevant to my analysis.

12   Q.  That was irrelevant.  So --

13          THE COURT:  Do you know whether he was guaranteed a

14   bonus at Diamond Lake?

15          THE WITNESS:  No.  What I cared about is what he

16   actually --

17          THE COURT:  Just answer the question.

18          THE WITNESS:  I'm sorry.

19          THE COURT:  The question is, do you know whether --

20          THE WITNESS:  I don't recall --

21          THE COURT:  -- he was guaranteed any bonus?

22          THE WITNESS:  No, I don't recall whether I saw that or

23   not.  I'm sorry.

24   BY MR. LEYVA:

25   Q.  Wouldn't you have to agree with me, Dr. Plancich, that

D86BPASH                    Dr. Plancich - cross

1    whether or not Mr. Pasternak had a guaranteed bonus at the

2    hedge fund which he took a position with would be relevant to

3    your conclusions in your report?

4    A.  No, I don't think that's relevant.

5    Q.  Looking at the offer letter for Morgan Stanley, which was

6    shown to you, and I think the judge questioned you, you

7    recognized he was at will.  Correct?

8    A.  Yes.

9    Q.  And you recognize that at will means that you're hired

10   today; you could be fired tomorrow.  Correct?

11   A.  Yes.

12   Q.  No cause, cause without any basis whatsoever.  And if that

13   occurred, none of the compensation set forth in the offer

14   letter would have been paid.  Correct?

15   A.  Yes.

16   Q.  Okay.  And you talked in terms of a million dollar bonus.

17   But you agree that that million dollar bonus would have been

18   paid in restricted stock units invested over a three-year

19   period.  Correct?

20   A.  That's correct, per investing requirements.

21   Q.  So, again, if Mr. Pasternak left for any reason or no

22   reason, he would not have gotten the full portion of that

23   million dollars.  Correct?

24   A.  My understanding is that for some --

25   Q.  Yes or no, Ms. Plancich?  Dr. Plancich.  I apologize.  Yes

1    or no?  If he leaves --

2    A.  For any reason?  My understanding is no, that's not true.

3    Q.  And it goes on to state that even his year-end bonus was

4    subject to a committee, a board of directors.  Correct?

5    A.  That's correct.

6    Q.  And as you sit here today, you could not tell a jury or the

7    judge today how this board of directors makes the determination

8    as to how a bonus package is calculated for an individual like

9    Mr. Pasternak.  Correct?

10   A.  That's correct.  I have no data on the board of directors.

11   Q.  Okay.  Understood.

12        Now, I think we've established that you agree that a

13   fund, such as the one that Mr. Pasternak was being considered

14   for Morgan Stanley, is something that would be-- I'm sorry, the

15   profits and the earnings would be derived from as well as he

16   does or as poorly as he does.  Correct?  In other words, the

17   fund's performance is linked directly to his oversight and

18   management.  Correct?

19   A.  I'm sorry, could you rephrase that?

20   Q.  Sure.

21   A.  I don't --

22   Q.  Let's talk about Mr. Pasternak was going to be the head of

23   this fund at Morgan Stanley.  Correct?

24   A.  My understanding is that he's going to be the head of U.S.

25   high yield.

D86BPASH                    Dr. Plancich - cross

1   Q.  Right.

2   A.  Which involves managing a number of portfolios as well as

3   portions of other portfolios.  So it's not a fund.

4   Q.  Right.

5       And Mr. Pasternak would have implemented his strategy

6   in connection with the subordinates, the traders that worked

7   below him.  Correct?

8   A.  Presumably, yes.

9   Q.  And you don't have any data or information in this report

10  that tells us how Mr. Pasternak would have implemented his

11  trading strategies, do you?

12  A.  That's right, because he didn't work at Morgan Stanley.

13  Q.  So we have no information or no data in your report as to

14  how he would have performed.  Correct?

15  A.  That's exactly why I used the high yield index as a proxy.

16  Q.  Understood.

17      And you understand that Mr. Pasternak's role was going

18  to be an active investor.  Correct?

19  A.  I'm sorry?

20  Q.  He would have been an active investor.  In other words, he

21  wasn't going to be passive and just invest in an index such as

22  the S&P, as the judge pointed out.  Correct?

23  A.  That's correct.

24  Q.  So, in essence, he could have looked at the Merrill Lynch

25  Index and said, I disagree with that and I want to go in

D86BPASH                        Dr. Plancich - cross

1    another direction.  Correct?

2    A.  Well, the index is all the securities in the market, so,

3    no, I don't think that's correct.  He would choose some subset

4    of those to invest in, but it's not that you would...

5    Q.  You agree with me, Dr. Plancich, that you have no insight

6    or understanding as to the universe of the stocks or the bonds

7    or the type of securities that he would have invested in.

8    Correct?

9    A.  Well, he would have invested in high yield securities.

10   Q.  Other than high --

11            THE COURT:  How many securities would there have been

12   covered by this fund?  By this index, rather.

13            THE WITNESS:  He would have chosen securities to

14   invest in, so I don't know how many he would have selected.

15            THE COURT:  I understand that, but my question is:

16   How many-- is it everything?  So how many different securities

17   are there covered by the index, roughly?

18            THE WITNESS:  Hundreds.

19            THE COURT:  Hundreds.

20            THE WITNESS:  Hundreds.

21   Q.  If not thousands?

22   A.  Yeah, if not thousands.

23   Q.  If not thousands.

24   A.  Yeah.  I don't have a count of what's in the index, but--

25            THE COURT:  Wait.  Not thousands or if not thousands?

D86BPASH                          Dr. Plancich - cross

1          THE WITNESS:  If not thousands.  Very, very many
2     because it's all U.S. --
3          THE COURT:  It could have been thousands.
4          THE WITNESS:  Yes.
5     Q.  So to that point, Doctor, the universe, that could have
6     spanned thousands and thousands of individual fixed-income
7     instruments, each would have had a distinct risk and return
8     characteristic or profile?  Yes?
9     A.  I'm sorry, what's the question?  That securities have
10    different risk and return profiles?
11    Q.  Yes.  You agree?
12    A.  Yes, they do.
13    Q.  Right.
14          And, again, that universe of thousands of different
15    funds, you would agree with me that it differs by industry?
16          MR. McCALLION:  Objection to form.
17    A.  I'm sorry, I'm confused.  You're saying funds and then
18    you're saying securities.  I'm not sure what you're talking
19    about.
20    Q.  Securities.
21    A.  Okay.
22    Q.  You would agree with me that there are differences in
23    what's being traded by industry.  Correct?
24          THE COURT:  I think the question is, it covers
25    thousands of different securities and companies across all

D86BPASH                         Dr. Plancich - cross

1    industries.

2              THE WITNESS:  Yes, that's true.

3              THE COURT:  Now, typically when someone has a fund --

4    for example, the portfolios that Mr. Pasternak would have been

5    in charge of at Morgan Stanley, how many stocks would have been

6    in those funds?  Any idea?

7              THE WITNESS:  Since he invested in high yield bonds

8    rather than stocks, I have no idea how many he would have

9    chosen.  That's his strategy.  Maybe he would have a lot; maybe

10   he would concentrate in a few.

11             THE COURT:  It would have been a small fraction of the

12   number of securities covered by the Merrill Lynch Index.

13   Agreed?

14             THE WITNESS:  That's my expectation.

15             THE COURT:  Yes.  And so the performance could vary

16   tremendously from the index depending on what you picked?

17             THE WITNESS:  You could beat the index; you could do

18   worse than the index.

19             THE COURT:  So in that sense, the Merrill Lynch

20   becomes sort of like a generalized indication of how all the

21   relevant securities were performing.

22             THE WITNESS:  How the high yield bond market was

23   performing.  That's exactly correct.

24             THE COURT:  It wouldn't surprise you if his particular

25   fund would have deviated significantly?

D86BPASH                        Dr. Plancich - cross

1            THE WITNESS:  Yeah, I would expect some correlation

2       because, at the end of the day, he's investing in high yield

3       securities, and so --

4            THE COURT:  Is there something that--

5            THE WITNESS:  But, yes, he could have done much better

6       or much worse than the index.

7            THE COURT:  Is there something that would have been

8       closer in nature and character to the portfolio that he would

9       have been in charge of than the Merrill Lynch Index?

10           THE WITNESS:  No, I don't think so because-- for

11      exactly the reasons that you just articulated.  Any one person

12      is going to pick some strategy and some selection of

13      securities, and we don't know what he or she would pick.  We

14      don't know what Mr. Pasternak would have picked.

15           THE COURT:  For that reason how can we use this then?

16           THE WITNESS:  The index is the best proxy.

17           THE COURT:  That's Mr. Kim's point, is it's like

18      saying How does the Standard & Poor's 500 do? and then using

19      that as a measure when you're investing in one company.  It

20      really depends on the company.

21           THE WITNESS:  That's right.  This is a proxy and I

22      think it's a very good and a reasonable proxy because we

23      don't-- Mr. Pasternak didn't have this job.  He didn't run

24      these portfolios.  There is no -- his strategy, it doesn't

25      exist because he didn't take this offer.

D86BPASH                        Dr. Plancich - cross

1              So this is a very reasonable alternative because it's

2     the universe of all of the types of securities from which he

3     could have selected so it's broad based.  He would probably

4     argue he would have beat the index.  He's a good manager.  But

5     we don't know that for sure because it didn't happen.  This

6     is a hypothetical.  So at the end of the day, I have to

7     estimate.

8              THE COURT:  Okay.

9              THE WITNESS:  I can't know.

10              MR. LEYVA:  Thank you.

11              THE COURT:  Go ahead.

12     BY MR. LEYVA:

13     Q.  It's clearly a hypothetical.  So you take a hypothetical of

14     negative 26 percent, which you show, that means that that

15     portfolio manager lost 26 percent of the capital that he was

16     given to manage.  Correct?  So if it was a million dollars, he

17     lost 26 percent of that.  He's going to go to a board and

18     they're going to say, Mr. Pasternak, we're going to award you

19     for losing 26 percent of your capital, that you were under

20     control of, a $1.1 million bonus.  That's what your report

21     says.  Correct?

22     A.  Yes, but your compensation --

23     Q.  Yes.  That's all I need.  Okay.

24              Now, you look at the next year, there's a 57.5 percent

25     gain.  You saw that, right?  But you agree with me, again, this

D86BPASH                    Dr. Plancich - cross

1    is a hypothetical number.  Correct?

2    A.  Well, the number is the actual return of the index.

3    Q.  On this index.  But at the end of the day, what you're

4    doing in terms of trying to calculate what Mr. Pasternak would

5    have earned is hypothetical.  Correct?

6    A.  Yeah, it's an estimate.

7    Q.  And there's no data that we can look at-- i.e., earnings

8    per portfolio manager -- that would support your hypothetical

9    income stream here.  Correct?

10   A.  Well, I --

11   Q.  Yes or no, Doctor?  We have no underlying supporting data

12   that we could show a jury that supports what you claim would be

13   Mr. Pasternak's hypothetical income stream.  Correct?

14   A.  We have the index and we have the hedge fund data in my

15   appendix.

16   Q.  That's as to earnings, as to returns on the funds.

17   Correct?

18   A.  Performance.

19   Q.  Right.

20        We have no data which supports your calculation that

21   Mr. Pasternak, on a year where his fund lost 26 percent, where

22   he would have been awarded a $1.1 million bonus.  Correct?

23   A.  Right.  That's a hypothetical.

24   Q.  Correct, that's a hypothetical.

25        And as you sit here today, you could not state with

D86BPASH                          Dr. Plancich - cross

1    any scientific basis or conclusions that in the year 2009 that

2    Mr. Pasternak's fund would have recognized a 58 percent

3    increase, can you?

4             MR. McCALLION:  Objection.

5    A.  Well, that --

6             THE COURT:  Sustained.

7             MR. LEYVA:  That's fine.  I'll move on, Judge.

8             THE COURT:  I understand the theory.

9             MR. LEYVA:  Okay.

10             THE COURT:  Let's move on.

11             MR. LEYVA:  Fair enough, Judge.

12   Q.  You're an economist.  Correct?

13   A.  That's correct.

14   Q.  And usually, Doctor, an economist will indicate his or her

15   degree of confidence in his findings by a margin of error.  You

16   didn't do that in your report, did you?

17   A.  If you're estimating --

18   Q.  Again, yes or no, Doctor?  You did not provide in your

19   report --

20   A.  You said typically an economist will do something.  I

21   think, no, that's not always the case.  It depends on what

22   you're doing in terms of your analysis.  And you're correct

23   that this does not have a margin of error in it.

24   Q.  And, in fact, because Mr. Pasternak never executed a trade

25   between 2008 and 2011, there's no way of knowing whether he

D86BPASH                    Dr. Plancich - cross

1    would have been on the high side of earnings or on the low

2    side.  Correct?

3    A.  That's correct.

4    Q.  And I think -- and I apologize if we went through this with

5    the judge.

6            You agree that the performance of a portfolio is

7    specific to that portfolio manager's trading strategies.

8    Correct?

9    A.  Yes, I do.

10   Q.  Okay.  And some portfolio managers fail miserably.

11   Correct?

12   A.  And some do very well.

13   Q.  And some do very well, correct.

14           But, again, we have no underlying data to provide to a

15   jury to establish how Mr. Pasternak in his funds would have

16   performed.  Correct?

17   A.  Because he wasn't given the opportunity to take this job.

18   Q.  Okay.  So you'd have to agree with me, Doctor, that what

19   your report outlines and the numbers and the calculations is

20   really a subjective guess on your part.  Correct?

21           MR. McCALLION:  Objection.

22           THE COURT:  Overruled.  You can answer.

23   A.  No, I don't think it's a subjective guess.  I think it's an

24   estimate that applies the rigorous techniques of economic

25   analysis.  But it's an estimate.

D86BPASH                    Dr. Plancich - cross

1   Q.   Okay.   It's fair to state, though, nowhere in your report

2   do you even try to analyze what Mr. Pasternak's trading

3   strategies would have been and how they would have performed

4   during this time period.   Correct?

5   A.   I used the index as a proxy.

6   Q.   Correct.

7            So you had the opportunity to go meet with

8   Mr. Pasternak before preparing your report.   Correct?   You had

9   the opportunity to meet with Mr. Pasternak.   Correct?

10  A.   I'm sure if I had requested, yes.

11  Q.   Yes.   You could have requested and I'm sure counsel would

12  have made him available.   Correct?

13  A.   I assume so.

14  Q.   You chose not to do so.   Correct?

15  A.   I did not need to.

16  Q.   Okay.   And a lot of what you base your opinion and

17  conclusions on with regard to Morgan Stanley were premised upon

18  a deposition of David Germany.   Correct?

19  A.   I rely on David Germany's deposition.

20  Q.   Yes.

21            Isn't it a fact, Dr. Plancich, that at the point in

22  time when some of these bonuses would have been awarded,

23  Mr. Germany was no longer at Morgan Stanley?

24  A.   Yes, that's correct.

25  Q.   Okay.   So you take what he said and you rely on it, but so

D86BPASH                          Dr. Plancich - cross

1    the record's clear, at the points in time where you make your

2    estimates as to what Mr. Pasternak would have earned, David

3    Germany was no longer at Morgan Stanley?

4    A.   David Germany describes the process by which bonuses are

5    paid.

6              THE COURT:  I'm not sure I know who Mr. Germany is.

7    What was his title?  When was he at Morgan Stanley?

8              MR. LEYVA:  We would proffer --

9              THE COURT:  Maybe there won't be disagreement, so just

10   tell me.

11             MR. LEYVA:  He was the gentleman who made the

12   employment offer to Mr. Pasternak at the point in time of the

13   offer and apparently was the head of that group for some period

14   of time.

15             THE COURT:  The global fixed-income group?

16             MR. LEYVA:  That's my understanding, Judge.

17             THE COURT:  When did he leave?

18             MR. LEYVA:  I believe he left in 2008, Judge, if the

19   deposition transcript reads correctly.

20             THE COURT:  And his deposition was taken when?

21             MR. McCALLION:  June 23rd, 2011.

22             THE COURT:  Okay.  All right.

23             MR. LEYVA:  Thank you.

24   BY MR. LEYVA:

25   Q.   And you do recognize in 2008 and 2009 this country was in

D86BPASH                          Dr. Plancich - cross

1    what many have called the worst financial crisis since the

2    Great Depression.  Correct?

3    A.  Okay.

4    Q.  Yes?

5    A.  Yes.

6    Q.  Okay.  And notwithstanding what went on in the marketplace

7    and notwithstanding substantial losses in one year, it would be

8    your testimony that there would still have been a

9    seven-figure-plus bonus paid to Mr. Pasternak in 2008?

10   A.  That's my estimate, yes.

11   Q.  Okay.  And, again, you use the word "estimate."  Correct?

12   A.  Yes.

13   Q.  Okay.

14            MR. LEYVA:  No further questions.

15            THE COURT:  Redirect?

16            MR. McCALLION:  Judge, one moment.

17            THE COURT:  Yes.

18            MR. McCALLION:  Nothing further.  Mr. Germany is

19   scheduled to be a trial witness.

20            THE COURT:  Okay.  Thank you.  You can step down.

21            (Witness excused)

22            THE COURT:  Why don't we take a short break and then

23   I'll come back and you can make some argument to me if you

24   wish.

25            (Recess)

1          THE COURT:  Please be seated.  Let me just give you

2     some preliminary thoughts and then you can focus your

3     arguments.  I think I'm okay with the use of the Merrill Lynch

4     Index.  I mean, I understand it's a proxy.  It's hypothetical.

5     I don't know if there's-- if there were an index that was more

6     closely aligned to the portfolio that Mr. Pasternak would have

7     headed, I mean maybe it would be better, but I don't-- there

8     are fair objections, but I think they go to weight and not to

9     admissibility.

10         I am concerned about the calculation, the theory that

11    there is this rigid application of this formula where you take

12    the prior year's bonus, you multiply it by one point whatever

13    the index was and you get the bonus for the current year.  That

14    seems somewhat speculative to me.  In essence, it makes this a

15    guaranteed bonus every year.  The amount will shift, but in

16    theory it becomes a guaranteed bonus.  Mr. Pasternak will get

17    what he got last year times one point the index.  That's not

18    what he bargained for.  I mean, he bargained for a guaranteed

19    bonus in year one.

20         Now, another problem with the theory is it assumes a

21    bonus even in bad years.  I just don't know if that's true.

22    And Dr. Plancich has not worked as an investment banker.  She's

23    not been involved in making bonus determinations.  I understand

24    that theoretically, in terms of the economics of it, but is

25    that really industry practice?  I don't know that there's

D86BPASH                          Dr. Plancich - cross

1   anything in the record.  I don't think Mr. Germany's deposition

2   says that.  Mr. Germany says, at pages 58, 59, 60 people

3   expected a bonus.  That's true.  Everyone wants a bonus.

4   Everyone expects a bonus.  That doesn't mean you're going to

5   get one.

6          I've not been in the investment banking industry, but

7   over the years I've had quite a few investment banking cases.

8   I always thought those bonuses were completely discretionary,

9   putting aside the guaranteed bonus from year one.  In fact, I

10  don't know that it's briefed.  I believe there is case law that

11  says, in the investment banking field, these discretionary

12  bonuses, I think there have been claims dismissed as a matter

13  of law.

14         Are these in the brief, these cases?

15         MR. LEYVA:  No, your Honor.

16         THE COURT:  We'll go look.  I believe that there have

17  been 12(b)(6) motions granted dismissing claims for

18  discretionary bonuses in the investment banking field -- I

19  mean, we haven't looked, but we'll go back and look -- on the

20  theory that they are discretionary bonuses.

21         I'm troubled by this aspect of it.  I'm not persuaded

22  by-- Mr. Germany doesn't say that people were guaranteed

23  bonuses.  People expected bonuses in the sense that everyone

24  thinks they're going to do well.  Everyone expects to do well

25  and everyone hopes that they'll get that big bonus at year end.

1    But my understanding is that that is not how the industry

2    works.

3              Put that aside for a moment.  I don't know that I have

4    before me any record evidence that supports the theory that you

5    can take a ratio of last year's bonus and that's what you get

6    for this year.

7              Now, I guess I'd like to hear Mr. Kim's counsel

8    address whether -- what do you do?  Damages can be estimated if

9    someone, indeed, is injured.  We don't need a precise

10   mathematical formula.  And why isn't this a reasonable way of

11   estimating the damages?  But it has to be-- I'm not saying you

12   should go now.

13             MR. LEYVA:  I'm sorry.

14             THE COURT:  I'm laying out my thoughts.

15             MR. LEYVA:  I apologize.

16             THE COURT:  Or does this become speculation?  I mean,

17   under Daubert in Rule 702, the expert's opinion has to be

18   reliable and relevant.  I mean, I think this is relevant.  The

19   question is whether this theory is a reliable one or does it

20   become speculation?  Is it based solely on the witness's

21   say-so?  These are some of my concerns.

22             But let me hear from plaintiff's counsel first.

23             MR. McCALLION:  Yes, your Honor.  First of all, the

24   defense expert, he didn't testify, but he never challenged the

25   methodology, in the sense the use of the Merrill Lynch

D86BPASH                              Dr. Plancich - cross

1   standard, for plus or minus.

2           THE COURT:  I think I said I don't disagree with that.

3           MR. McCALLION:  Okay.

4           THE COURT:  Using the Merrill Lynch standard.  I mean,

5   I'm inclined to rule in your favor on that part.  My concern is

6   more the formula, the assumption of, in essence, a guaranteed

7   bonus from year to year.

8           MR. McCALLION:  Okay.  Well, perhaps we read

9   Mr. Germany's testimony differently.  Mr. Germany, page 160:

10  "I am not aware of a single time that a member of the

11  fixed-income team" --

12          THE COURT:  I don't have 160.

13          MR. LEYVA:  No, 60.

14          MR. McCALLION:  I'm sorry, 60.  Did I say 160?

15          THE COURT:  Yes.

16          MR. McCALLION:  I'm sorry.  "I am not aware of a

17  single time that a member of the fixed-income team did not

18  receive a bonus."  A few lines down --

19          THE COURT:  Do you think that--

20          MR. McCALLION:  If they completed the year--

21          THE COURT:  Do you think that that is, in essence,

22  saying that the members of the team were guaranteed a bonus?

23  He hadn't had a year like-- up until that point, there hadn't

24  been a year like 2008.  He wound up leaving.  If you go back to

25  59, starting at line 6:  "The firm expectation of all people is

D86BPASH                    Dr. Plancich - cross

1   they are going to receive a bonus.  If one did not receive a

2   bonus, that is a very clear signal that you don't have much

3   time left at Morgan Stanley."  That makes it clear that

4   sometimes people didn't get bonuses.  Maybe his group did

5   pretty well, but he left.  Others were leaving.  Others left.

6   Why did they leave?  I wonder if they left because they didn't

7   get their bonuses.  I don't know.

8            MR. McCALLION:  Well, we don't know because

9   Mr. Pasternak was not there, so how do you go about estimating

10  what would have happened?  As the witness testified,

11  Mr. Pasternak would have done better or worse than the index.

12  But the index is, in the economic field that she testified, an

13  index is a normative value.  It's a standard by which --

14           THE COURT:  I'm okay with the index.

15           MR. McCALLION:  -- we can accept--

16           THE COURT:  I am okay with the index.  What I am

17  troubled by is the notion, in essence, that there is a

18  guaranteed bonus from year to year and the amount can vary, but

19  not the fact of a bonus.  That's where I'm having trouble.

20  Where does that come from?  Is that truly industry practice?

21  If so, where is that in the record?

22           MR. McCALLION:  Well, we believe it's in Mr. Germany's

23  testimony.  But before the expert testifies, you will hear from

24  a number of witnesses who will testify as to industry practices

25  which track the expert's assumptions, namely that your --

D86BPASH                          Dr. Plancich - cross

1          THE COURT:  Is there any law on whether this is an

2    appropriate measure of damages, any case law on this?

3          MR. McCALLION:  Well, there's a lot of case law on the

4    use of indexes in order to-- as a proxy for --

5          THE COURT:  Is there any case law --

6          MR. McCALLION:  -- a "but for."

7          THE COURT:  Is there any case law regarding the

8    payment of a discretionary bonus?  Discretionary bonuses as an

9    element of damages.  Is there case law on that?  I'm not

10   talking about how much.

11         MR. McCALLION:  Right.

12         THE COURT:  I'm talking about whether.  Is there case

13   law on whether discretionary bonuses can be awarded as damages

14   in this kind of a case?  Is there law?  Does anyone know?  Has

15   anyone looked?  I'm not hearing anything.

16         Okay.  We'll go look.  We'll go look.  I understand

17   your point.

18         Anything else you want to tell me?  I'm not going to

19   decide right now.  I'm going to go take a look at the law, but

20   those are my concerns.

21         MR. McCALLION:  Only that we would proffer that the

22   testimony at trial before the expert testifies is that the

23   prior year's bonus, in this case the 1.5 starting point, would

24   be your yardstick or benchmark for your up or down on the next

25   year's salary base after performance is taken into

D86BPASH                          Dr. Plancich - cross

1      consideration.

2              THE COURT:  I don't really have a problem with that,

3      but how far up and down?  And what is in the record that says

4      how far up and down?  You look at the index.  Is there anything

5      that says that in the record?

6              MR. McCALLION:  Well, it would be tied to performance

7      up or down.  And we know that the Merrill Lynch Index is the

8      norm or the average of the industry for any stock -- any

9      portfolio--

10             THE COURT:  For all stocks.  I think I'm with you on

11     that, but it's still troubling.  It's not all stocks, but it's

12     potentially thousands of securities.

13             MR. McCALLION:  Yes.

14             THE COURT:  And we're using that as a measure for what

15     Mr. Pasternak would have done with his obviously much smaller

16     portfolio.  And I'm probably okay with that because I don't

17     know that there's anything better than that.

18             Anything else you want to tell me?  Is there anything

19     else in the record to support the theory that you can just take

20     last year's bonus and multiply it using this year's index?  Is

21     there anything that's in a treatise, any learned journal about

22     the industry?  Anything like that?  Has anyone looked for

23     that?

24             MR. McCALLION:  Only more generally in the context

25     that the use of an index as opposed to a particular fund under

D86BPASH                        Dr. Plancich - cross

1       the management of an individual who's not the individual in

2       question is that the use of an index is better as a proxy than

3       looking at this fund or that fund.

4                   THE COURT:  I don't disagree with that.

5                   Okay.  Mr. Holman?

6                   MR. HOLMAN:  Just one thing.  I looked a little bit in

7       the last several weeks, internet kind of research.  There have

8       been studies, compensation studies, which did address in the

9       financial services industry how compensation was affected by

10      the financial crisis.

11                  THE COURT:  Your witness isn't aware of that because I

12      asked for that.

13                  MR. HOLMAN:  Well, we didn't --

14                  THE COURT:  I don't know that it's admissible or

15      relevant.  I just asked.  It might be useful to know that

16      compensation dropped or increased for the industry during

17      these-- Congress was getting all upset.  Everybody was getting

18      upset.  I would think that there would be some articles and

19      reports and studies; may be wholly inadmissible, but we don't

20      know until we see them.

21                  MR. LEYVA:  Thank you, your Honor.

22                  THE COURT:  Yes.

23                  MR. LEYVA:  Not to harp on the rule, but the rule, as

24      your Honor points out, it's pretty -- I know there's broad

25      discretion to your Honor, but let's look at what we're having.

D86BPASH                      Dr. Plancich - cross

1    We're going to have a jury sit in this box, eight people, and

2    this expert is going to be called on to assist them to

3    understand.  What are they going to understand by her

4    testimony?

5         Now, I know your Honor says I'm okay with the index,

6    but your Honor --

7         THE COURT:  I said I think I'm okay.

8         MR. LEYVA:  But, your Honor, you heard the good doctor

9    testify.

10        THE COURT:  What else could you do?  My problem is,

11   look, there are surely flaws with using the index.  I grant

12   that.  But, you know, a plaintiff who indeed is injured can't

13   be left without any remedy.  And what you're trying to do is to

14   estimate damages, and this is what a jury does.  In general,

15   this is how the market did.  We ask you to find that he did

16   better.  So that's my thinking on that.

17        MR. LEYVA:  Understood, your Honor.  However,

18   Mr. Pasternak could take the stand and testify very easily as

19   to what his offer was, what he believed he would have made, and

20   his understanding.  Because I think what's key and critical

21   here, which your Honor also touched upon, thousands upon

22   thousands of different securities make up this index.  And the

23   expert and counsel never took the opportunity they had to sit

24   with Mr. Pasternak and gain an understanding as to his trading

25   strategies.

D86BPASH                          Dr. Plancich - cross

1            If they would have did that and said, okay, we met

2    with Mr. Pasternak; let me show you what he told us.  This is

3    the way he would have invested.  These are his strategies.  I

4    looked at an index and now there's some underlying at least

5    support.  But just to say disregard what Mr. Pasternak would

6    have done, he could have --

7            THE COURT:  Are there more specific indexes that

8    exist?  In other words, is there anything in the record to tell

9    us what he would have focused on?  Was he a specialist in any

10   particular area?

11           Mr. Holman, do you know?

12           MR. HOLMAN:  He actually constructed in 2008 a mock

13   portfolio at Diamond Lake for the purpose of assisting the

14   marketing effort.

15           THE COURT:  But would he have done that at Morgan

16   Stanley?  Would he have used that same--

17           MR. HOLMAN:  You can't be absolutely certain, no.

18           THE COURT:  But is there evidence that this is

19   essentially what I would have done at Morgan Stanley?

20           MR. HOLMAN:  This is essentially what he would have

21   done in 2008.  If he had been at Morgan Stanley in 2008, I --

22           THE COURT:  Did he indicate any particular industries

23   that he would have focused on, any particular areas?

24           MR. HOLMAN:  He has.  There's a portfolio which

25   specifies exactly what he would have done.

D86BPASH                          Dr. Plancich - cross

1          THE COURT:  What industries?  What areas?  Is there a

2    way to characterize it?

3          MR. HOLMAN:  I believe he had a-- there was a housing

4    industry bet against where I believe he shorted the housing

5    sensitive corporate bonds.

6          THE COURT:  My point is this.  Let's call it housing

7    for these purposes.  He would have focused on housing.  Is

8    there an index that would be better if one were focusing on

9    housing?

10         MR. HOLMAN:  It would have actually been this index,

11   because this index contains these below-investment-grade

12   corporate bonds.  So that's the sort of thing he was investing

13   in.

14         THE COURT:  My question is-- forget housing.

15   Technology.

16         MR. HOLMAN:  Yes.

17         THE COURT:  Anything.  My point is, are there more

18   specific indices that could have been used that would have been

19   more accurate?  That's my question.

20         MR. HOLMAN:  I'm not aware.

21         THE COURT:  Are either one of you aware of any?

22         MR. HOLMAN:  I am not.

23         MR. LEYVA:  I am not, Judge.

24         THE COURT:  Move on to the second one.

25         MR. LEYVA:  So the second one is the reliability on

1    the data and the calculations.  So Dr. Plancich clearly has

2    very nice qualifications.  Okay?  So I'm not going to be able

3    to stand there and, respectfully, beat her up because she

4    doesn't pass the test.  We're going to let this witness

5    testify, who is proposed to be an expert, and tell this jury,

6    which is not based upon scientific data or the like, just this

7    is what I think would have happened and this is what I think,

8    notwithstanding the fact that David Germany tells you, look,

9    2008 was a bad year for investment banking.

10           THE COURT:  It's not a matter of whether it's

11   scientific.  I mean, it's not scientific--

12           MR. LEYVA:  I'm sorry, I did use the term

13   "scientific."  There is also no underlying supportable data

14   that would even suggest or that could even support the analysis

15   that shows an increase in --

16           THE COURT:  Let me just be clear on one thing.  Expert

17   testimony must be based on sufficient facts or data.  It must

18   be the product of reliable principles and methods properly

19   applied.  The expert can base her opinion on professional

20   studies or personal experience, but it cannot be speculative,

21   it cannot be conjectural, it cannot be unrealistic and

22   contradictory.

23           So the question here is whether there is a basis for

24   the theory.  It could be based on her personal experience, but

25   here she doesn't have any.  So what is it based on, this notion

1    of taking last year's bonus and multiplying it by the index?

2              MR. LEYVA:  So, your Honor, to that point is where

3    under 702 this expert fails to provide sufficient facts or data

4    and the testimony is not the product of reliable principles and

5    methodologies because it's a guess.  It's a speculation.  When

6    I asked her, You've never dealt with a trader?  No, I did not.

7    I have no experience.  I don't know, I don't know, I don't

8    know.  So how do we let that go to a jury in terms of

9    "calculating damages"?  And I would like the opportunity to

10   submit, even if it's a letter brief, by Thursday or Friday --

11             THE COURT:  How do you respond to the argument that

12   if, indeed, he was wronged here, he's entitled to some measure

13   of recovery?  The law recognizes that it need not be precise,

14   exact, mathematical.  We can do a reasonable estimate.  Why

15   isn't this a reasonable estimate?

16             In other words, they thought he was worth the $1.5

17   million guaranteed bonus and the base salary.  That's a

18   reasonable starting point.  It's a reasonable measure of his

19   worth.  And the following year we knock it down by the

20   performance.

21             MR. LEYVA:  Because at the end of the day, your Honor,

22   there's nothing to support a conclusion being premised by an

23   expert that when a portfolio manager loses 26 percent of the

24   capital which he is provided to manage, he loses 26 percent of

25   the capital and he's going to be turned around in 2008, when

D86BPASH                      Dr. Plancich - cross

1   David Germany tells us it's a very bad year for investment

2   banking and people were leaving and he left, that someone would

3   have handed him a check for $1.1 million. But we're going to

4   have an expert tell a jury that that's what the market is or

5   that's what the standard is? And you heard --

6        THE COURT: I think Dr. Plancich did say at one point

7   that that was the industry practice.

8        MR. LEYVA: We have no underlying support in her

9   report. I have nothing to challenge that on.

10       THE COURT: It's certainly counterintuitive, that you

11   would give someone a million dollar bonus if he had lost 26

12   percent of your equity--

13       MR. LEYVA: So to your Honor's comment -- I apologize.

14       THE COURT: Let's finish up.

15       MR. LEYVA: So, again, your Honor, because we have no

16   underlying data, no underlying facts, no underlying support,

17   where this expert can say this is what I relied upon versus her

18   mere speculation, you cannot let that testimony go to a jury in

19   light of what Rule 702 and the applicable cases say.

20       THE COURT: Was this guy-- what's his name again, the

21   Morgan Stanley guy?

22       MR. LEYVA: Mr. Germany.

23       THE COURT: Was he the only Morgan Stanley witness to

24   be deposed?

25       MR. LEYVA: Yes.

1          THE COURT:  Do we have any other evidence as to how

2     Morgan Stanley calculated bonuses?

3          MR. LEYVA:  And his testimony says it's there.  They

4     have it.  But for whatever reason, it was never subpoenaed, the

5     same way the performance was never subpoenaed.

6          THE COURT:  I'm sorry, my question was, other than

7     what we read, pages 58, 59, 60, anything else?

8          MR. LEYVA:  Nothing in the record.  Nothing.

9          THE COURT:  Okay.  I'll rule as soon as I can, but if

10    you want to take a look and submit something, you can, but it's

11    Tuesday.

12         MR. LEYVA:  Thursday morning, your Honor?

13         THE COURT:  Thursday morning, 10:00, simultaneous

14    submissions if you want to submit something.  I'll try to rule,

15    if I can, this week as to whether Dr. Plancich can testify.  If

16    I knock out this bonus part, I don't know that we would need

17    her for the rest of it, but I would entertain a request to call

18    her.  I am somewhat troubled by the second part of it, in any

19    event, but we'll take a look.  And, in particular, I do have a

20    recollection of case law on discretionary bonuses, but we'll

21    take a look.

22         Okay.  Anything else today?

23         All right.  Off the record.

24         (Discussion off the record)

25         THE COURT:  On the record.

D86BPASH                    Dr. Plancich – cross

1              Letters simultaneously on Thursday, 10 a.m.   Thank

2     you.

3              MR. LEYVA:   Thank you, your Honor.

4              MR. McCALLION:   Thank you.

5              (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25